ARMCO STEEL, et al., Respondents,

v.

CITY OF KANSAS CITY, Missouri, et al., Appellants.

No. 76094.

Supreme Court of Missouri, En Banc.

Aug. 15, 1994.

As Modified on Denial of Rehearing Sept. 20, 1994.

**4**

Kathleen A. Hauser, Acting City Atty., Patricia R. Jensen, Asst. City Atty., Kansas City, for appellants.

W.H. "Bert" Bates, Patrick J. Gregory, Kansas City, Robert Johnson, Arthur L. Smith, Diana M. Schmidt, St. Louis, Byron J. Beck, F. Rebecca Sapp, W. Dennis Cross, Kansas City, Michael E. Lazzo, Wichita, KS, for respondents.

LIMBAUGH, Judge.

Respondents,[1] all of which are natural gas consumers in Kansas City, Missouri, brought suit challenging the authority of the City of Kansas City ("the City")[2] to impose a license fee on purchases of natural gas from sources other than KPL Gas Service ("KPL"), the City's exclusive gas service franchisee. The trial court sustained Respondents' motions for summary judgment, declared the ordinances on which the fee was based invalid, enjoined the City from further collection of the fee, and ordered refunds of those fees already collected. The City appealed directly to this Court. Because this case requires the construction of revenue laws, this Court has exclusive jurisdiction. *Art. V, § 3, Mo. Const.* The judgment is affirmed.

Under an exclusive franchise agreement, the City authorizes KPL Gas Service to sell natural gas at retail to customers residing in Kansas City. The agreement also provides for KPL to use the City's infrastructure for placement of pipeline so that gas may be delivered to KPL customers. In return, KPL pays the City a license fee equivalent to 10% of the gross receipts from the retail sale of the gas.

Respondents purchase natural gas on the open market from locations outside of Missouri. Although Respondents purchase no natural gas from KPL, they contract with KPL for the transportation of the gas to their facilities in Kansas City.

On November 30, 1989, the City Council of Kansas City, Missouri, passed Ordinance 64906, which requires the licensing of all commercial users of natural gas purchased from suppliers other than KPL. The ordinance also imposes a 10% license fee on those commercial users. The voters of Kansas City approved the passage of this ordinance in February, 1990. Thereafter, on April 19, 1990, the City Council passed Ordinance 65427, adopting certain regulations pertaining to the imposition and enforcement and collection of the licensing fee enacted under Ordinance 64906. Under these regulations, the 10% fee is calculated on the value of

---

1. Respondents are Trigen Kansas City District Energy Corporation; Marrion Merrell Dow, Inc.; Koch Materials Company; Continental Baking Company; Paulos Products Company; HBE Corporation d/b/a/ Adam's Mark; Armco, Inc.; Reynolds Metals Company; Transworld Airlines, Inc.; Faultless Laundry Company; Miles Inc.; General Mills, Inc.; Owens–Corning Fiberglas Corporation; Business Men's Assurance Compa-ny of America; The Folger Coffee Company; Missouri Plating Company; and The Children's Mercy Hospital.

2. Appellants are the City of Kansas City; Janice Moen Reed, the City Treasurer; Dan E. Walstrom, the Commissioner of Revenue; Verlyn Leiker, The Director of Finance.

natural gas purchased and transported into the City for industrial and commercial consumption. Respondents paid the license fees under protest prior to filing the suit from which this appeal is taken.

Among the several grounds advanced by Respondents in support of their challenge is that the ordinances violate the commerce and supremacy clauses of the United States Constitution, and the provisions of 42 U.S.C. § 1983. We need not consider these questions because this case can be decided on other grounds. Specifically, we find these ordinances invalid because of limitations placed on the City's authority by *§ 71.610, RSMo.*

■ As a preliminary matter, we note considerable confusion among the parties concerning the nature and characterization of the "license fee." The ordinance refers to four apparently synonymous terms: "natural gas transportation fee," "quarterly transportation license fee," "gas consumer transportation license fee," and "gas consumer quarterly transportation license fee." Both sides concede in their briefs that the "license fee" is neither a sales tax nor a use tax. Respondents contend that the "license fee" is a "business or occupation license tax." On the other hand, the City suggests the "license fee" is actually a "user fee" that is imposed on the use of the City's infrastructure. The record supports the Respondents' position.

■ Under the ordinances, the City imposed a "license fee" on Respondents for engaging in the business or occupation of "natural gas consumer."[3] The ordinances refer only to a "license fee," not as a "user fee." A license tax or license fee is "a fee, sum, charge, or tax enacted as consideration for issuance of a license to engage in a business occupation." *City of Odessa v. Borgic,* 456 S.W.2d 611, 615 (Mo.App.1970). The City acknowledges in its brief that "Respondents ... pay an occupational license fee to Appellant City for the privilege of doing business in Kansas City." As described by the City, itself, the "license fee" fits clearly within the definition of a license fee or license tax. Based on the language of the ordinances and the City's concessions, we conclude that the fee imposed is indeed a "license fee" and not a "user fee."

■ In its first point relied on, the City contends that it had authority to impose the "transportation license fee" under art. VI, § 19(a) of the Missouri Constitution, which states:

> Any city which adopts or has adopted a charter for its own government, shall have all powers which the general assembly of the State of Missouri has authority to confer upon any city, provided such powers are consistent with the constitution of this state and are not limited or denied either by the charter so adopted or by statute. Such a city shall, in addition to its home rule powers, have all powers conferred by law.

Art. VI, § 19(a). The City correctly notes that the broad grant of powers under § 19(a) is not subject to any express exception for the enactment of fees and taxes. Nevertheless, those powers are subject to any limitations or contrary provisions set out in the Missouri Constitution, the Kansas City Charter, or any pertinent statutes. One of those limitations[4] is found in *§ 71.610, RSMo 1986,* which provides:

---

3. For purposes of this opinion, we accept as true the City's characterization of the Respondents as being engaged in the business or occupation of "natural gas consumer." It is arguable that the ordinances are also invalid because the classification of natural gas consumer is not truly a business or occupation and, therefore, not properly the subject of a license fee or license tax. Because we invalidate the ordinances on other grounds, we need not address the issue.

4. Respondents call to our attention another potentially limiting provision, art. X, § 1, of the Missouri Constitution, which, provides: "The

taxing power may be exercised by the general assembly for state purposes, and by counties and other political subdivisions under power granted to them by the general assembly for county, municipal and other corporate purposes." According to the Respondents, this provision prevents municipalities from enacting fees and taxes without statutory authorization. The City argues, however, that art. VI, § 19(a) overrides art. X, § 1. We do not address the interplay between the two sections because this case can be decided on the basis of *§ 71.610.*

No municipal corporation in this state shall have the power to impose a license tax upon any business, avocation, pursuit or calling, unless such business, avocation, pursuit or calling is specially named as taxable in the charter of such municipal corporation, or unless such power be conferred by statute.

■ In the application of *§ 71.610*, the issue is whether a "natural gas consumer," as that term is used in Ordinance 64906, is an occupation "specially named as taxable in the charter." For an occupation to be "specially named," it is sufficient if it "clearly comes within the definition and meaning of the enumerated subjects or is in fact a genus of one of the named occupations." *City of St. Charles v. St. Charles Gas Co.*, 353 Mo. 996, 185 S.W.2d 797, 798 (1945). The occupation or business of "natural gas consumer" will be taxable, in other words, so long as it falls within a specified class of occupations.

Although there are scores of "businesses, avocations, pursuits and callings" under Article I, Sec. 1(57) of the charter, the City cites only one business, a "transfer company," that might encompass the business of "natural gas consumer." The term "transfer company" is defined as "a transportation company that transfers passengers or baggage usu[ally] for a short distance between specified points or terminals." *Webster's Third International Dictionary (Unabridged)* at 2427. In a broader sense used to describe certain litigants in Missouri case law, a transfer company includes any company in the business of transporting freight or other products for hire. *See, e.g., State ex rel. Beaufort Transfer Co. v. Public Service Commission of Missouri*, 610 S.W.2d 96 (Mo.App. 1980); *Govreau v. Farmington Transfer Co.*, 473 S.W.2d 750 (Mo.App.1971); *Mason v. F.W. Strecker Transfer Co.*, 409 S.W.2d 267 (Mo.1966). "Natural gas consumer," on the other hand, is defined under Ordinance 64906 as "every corporation, company, association . . . purchasing natural gas from outside the city which is transported into this city for commercial use. . . ."

These two classifications, in our view, are unrelated. The "natural gas consumer" *purchases* gas that is to be transported into the

city; the "transfer company" *transports* freight or other products for hire. Even if it could be said that "natural gas consumers" are by definition businesses that actually transport natural gas, and in that sense are transfer companies, there are no facts in the record to bring respondents within that definition. Respondents do not transport natural gas themselves, but instead they contract with KPL for that purpose. We cannot fathom that a business becomes a "transfer company" simply because it arranges to have a product transported to its place of business. Accordingly, we hold that "natural gas consumer" under Ordinance 64906 is not "specially named" as taxable in the city charter; therefore, the ordinance violates *§ 71.610.*

As an alternate source of authority for imposition of the "transportation license fee," the City cites *§ 92.045, RSMo Supp.1992*, which provides in pertinent part:

1. Any constitutional charter city in this state which now has or may hereafter acquire a population in excess of three hundred fifty thousand inhabitants, according to the last federal decennial census, is hereby authorized, for city and local purposes, to license, tax, and regulate the occupation of merchants, manufacturers, and all businesses, avocations, pursuits and callings that are not exempt from the payment of licenses by law. . . .

*§ 92.045, RSMo Supp.1992.* In *Nicolai v. City of St. Louis*, 762 S.W.2d 423 (Mo. banc 1988), this Court held that the authority granted under *§ 92.045* effectively exempted the City of St. Louis from the general requirement in *§ 71.610* that occupations and businesses, must be "specially named as taxable in the [city] charter. . . ." *§ 71.610, RSMo 1986.* The City claims that it is likewise exempted.

■ However, in 1988 when *Nicolai* was decided, and in 1990 when Ordinances 64906 and 65427 were enacted, *§ 92.045* applied only to the City of St. Louis. Not until 1992 did the general assembly amend *§ 92.045* to include all charter cities which, like Kansas City, have populations "in excess of three hundred fifty thousand inhabitants." Because *§ 92.045* did not apply at the time the ordinances were enacted, the prohibition of

§ 71.610 controls. The effect of that prohibition is that the ordinances were void and unenforceable *ab initio*—at the time of enactment. *Page Western v. Community Fire Protection*, 636 S.W.2d 65, 67 (Mo. banc 1982). Nor were the ordinances validated or ratified by the 1992 amendment of § 92.045. In an analogous context, this Court has stated that an unconstitutional statute "is not validated by a subsequent constitutional amendment, except, possibly, where the latter ratifies and confirms it ..." *State v. O'Malley*, 342 Mo. 641, 117 S.W.2d 319, 324 (banc 1938); 16 *C.J.S.*, *Con.Law* § 44, p. 122. Without express ratification and confirmation, the statute must be reenacted. *Id.* This rule is equally applicable to an ordinance that was prohibited by a statutory provision at the time of its enactment. For these reasons, we hold that the City's reliance on § 92.045 is without merit.

In its last point, which is unrelated to the validity of the ordinance, the City claims that the trial court erred in applying the tax protest provisions of § 139.031, RSMo Supp. 1993, to municipal corporations. That statute is divided into nine subsections, the first of which grants taxpayers the right to protest taxes assessed against them, except those taxes collected by the state Director of Revenue. Subsections 5 and 6 pertain to taxes "mistakenly or erroneously paid," as opposed to taxes paid under protest. The remaining subsections specify the procedures to be followed for cases involving protested taxes. The complete text of § 139.031 is set out in Appendix A.

Reference to subsection 1 alone defeats the City's claim. That subsection states in pertinent part that "[a]ny taxpayer may protest all or any part of any taxes assessed against him except taxes collected by the Director of Revenue of Missouri." The right to protest taxes under that subsection is stated without equivocation or qualification, subject to the sole exception for the Director of Revenue. The right depends neither on the kind of tax assessed nor on the taxing authority. This Court is unwilling to read into the statute an exception for taxes imposed by municipal corporations.

Nevertheless, the City contends that § 139.031 applies only to the assessment of taxes collected by "county collectors" because there is no reference to city or municipal collectors, and the terms "collectors" and "county collectors" throughout the statute appear interchangeable and synonymous. In other words, the term "collectors" in some subsections and the term "county collectors" in others necessarily indicates, as the City explains, that "collectors" means "county collectors." We disagree.

In the statutory scheme, only subsections 5 and 8 refer to "county collectors." All other subsections refer to "collectors," except for subsection 6, which uses neither term.

■ Contrary to the City's argument, the terms "collectors" and "county collectors" are distinct and different. The former is a general term applicable to tax collectors of every kind; the latter is a particular term applicable only to one kind of collector. In contending that the terms "county collectors" and "collectors" are interchangeable and synonymous, the City discounts the possibility that the legislature may have intended a separate and independent function for "county collectors" than it intended for city and municipal collectors. Indeed, the legislature's use of different terms in different subsections of the same statute is presumed to be intentional and for a particular purpose. *State ex rel. State Highway Commission v. Carlton*, 453 S.W.2d 642, 650 (Mo.App.1970); 73 Am. Jur.2d Statutes, § 235, p. 417.

As stated earlier, subsection 5, in tandem with subsection 6, pertains only to taxes "mistakenly or erroneously paid" and does not pertain to taxes paid under protest. The fact that subsections 5 and 6 pertain to a subject different from that found in the other subsections indicates that use of the term "county collector" was intentional and purposeful.

■ In subsection 8 the legislative intent and purpose for using the term "county collectors" rather than the term "collectors" is apparent. That subsection requires "county collectors" to "notify any taxing authority of

the taxes paid under protest which would be received by such taxing authority if the funds were not the subject of a protest." The purpose for this requirement—to give notice of tax protests to taxing authorities that would not otherwise know of the protest—is pertinent to "county collectors," but not to other "collectors" such as city or municipal collectors. "County collectors" collect taxes for a variety of taxing authorities other than the county itself, such as road districts and school districts, § 137.035, RSMo 1986. None of these taxing authorities would know of tax protests without the notification requirement of subsection 8. On the other hand, city and municipal collectors—including those in Kansas City (see art. XII, § 371, Charter of Kansas City)—collect taxes solely for the city or municipality and its agencies. Consequently, there are no other taxing authorities to notify. The legislature has apparently determined that the need for "county collectors" to notify other taxing authorities of tax protests does not extend to other "collectors."

■ The separate and independent functions assigned to "county collectors" under subsections 5 and 8, confirm that the term "county collectors" is indeed different from the term "collectors." We conclude that the term "collectors" is not limited to "county collectors" but encompasses all kinds of tax collectors including city and municipal collectors. Under § 139.031, the assessment of taxes collected by city and municipal collectors are therefore subject to protest.

*Crest Communications v. Kuehle*, 754 S.W.2d 563 (Mo. banc 1988),[5] is the only case cited by the City for the proposition that the use of "county collectors" in some subsections qualifies the term "collectors" used in the other subsections. *Crest Communications*, however, is much more limited. Although it states that subsection 5 applies only to the assessment of taxes collected by "*county collectors*," it does not address whether other subsections are likewise limited. As we have noted, subsection 5 pertains only to taxes "mistakenly or erroneously

paid," and not, as in this case, to taxes paid under protest. Consequently, *Crest Communications* is inapplicable.

The judgment of the trial court is affirmed.

COVINGTON, C.J., HOLSTEIN, BENTON, THOMAS and ROBERTSON, JJ., and LONG, Special Judge, concur.

PRICE, J., not sitting.

### APPENDIX A

139.031. Payment of taxes under protest—action, when commenced, how tried—refunds, how made, may be used as credit for next year's taxes—interest, when allowed—collector to invest protested taxes, disbursal to taxing authorities, when.—1. Any taxpayer may protest all or any part of any taxes assessed against him, except taxes collected by the director of revenue of Missouri. Any such taxpayer desiring to pay any taxes under protest shall, at the time of paying such taxes, file with the collector a written statement setting forth the grounds on which his protest is based. The statement shall include the true value in money claimed by the taxpayer if disputed.

2. The collector shall disburse to the proper official all portions of taxes not disputed by the taxpayer and shall impound in a separate fund all portions of such taxes which are in dispute. Except as provided in subsection 3 of this section, every taxpayer protesting the payment of taxes shall, within ninety days after filing his protest, commence an action against the collector by filing a petition for the recovery of the amount protested in the circuit court of the county in which the collector maintains his office. If any taxpayer so protesting his taxes shall fail to commence an action in the circuit court for the recovery of the taxes protested within the time prescribed in this subsection, such protest shall become null and void and of no effect, and the collector shall then disburse to the proper official the taxes impounded, and

---

5. The City also cites *General Motors Corp. v. City of Kansas City,* Slip opinion, 1994 WL 49620 (W.D. No. 46246 as modified February 22, 1994). Reliance on this case is improper because it is now pending before this Court on application for transfer, and therefore it is not a final decision.

any interest earned thereon, as provided above in this subsection.

3. No action against the collector shall be commenced by any taxpayer who has, for the tax year in issue, filed with the state tax commission a timely and proper appeal of the protested taxes. Such taxpayer shall notify the collector of the appeal in the written statement required by subsection 1 of this section. The taxes so protested shall be impounded in a separate fund and the commission may order all or any part of such taxes refunded to the taxpayer, or may authorize the collector to release and disburse all or any part of such taxes in its decision and order issued pursuant to chapter 138, RSMo.

4. Trial of the action in the circuit court shall be in the manner prescribed for nonjury civil proceedings, and, after determination of the issues, the court shall make such orders as may be just and equitable to refund to the taxpayer all or any part of the taxes paid under protest, together with any interest earned thereon, or to authorize the collector to release and disburse all or any part of the impounded taxes, and any interest earned thereon, to the appropriate officials of the taxing authorities. Either party to the proceedings may appeal the determination of the circuit court.

5. All the county collectors of taxes, and the collector of taxes in any city not within a county, shall, upon written application of a taxpayer, refund any real or tangible personal property tax mistakenly or erroneously paid in whole or in part to the collector, or shall credit against the taxpayer's tax liability in the following taxable year any real or personal property tax mistakenly or erroneously levied against the taxpayer and collected in whole or in part by the collector. Such application shall be filed within one year after the tax is mistakenly or erroneously paid. The governing body, or other appropriate body or official of the county or city not within a county, shall make available to the collector funds necessary to make refunds under this subsection by issuing warrants upon the fund to which the mistaken or erroneous payment has been credited, or otherwise.

6. No taxpayer shall receive any interest on any money paid in by him erroneously.

7. All protested taxes shall be invested by the collector in the same manner as assets specified in section 30.260, RSMo, for investment of state moneys. A taxpayer who is entitled to a refund of protested taxes shall also receive the interest earned on the investment thereof. If the collector is ordered to release and disburse all or part of the taxes paid under protest to the proper official, such taxes shall be disbursed along with the proportional amount of interest earned on the investment of the taxes due the particular taxing authority.

8. On or before March first next following the delinquent date of taxes paid under protest, the county collector shall notify any taxing authority of the taxes paid under protest which would be received by such taxing authority if the funds were not the subject of a protest. Any taxing authority may apply to the circuit court of the county or city not within a county in which a collector has impounded protested taxes under this section and, upon a satisfactory showing that such taxing authority would receive such impounded tax funds if they were not the subject of a protest and that such taxing authority has the financial ability and legal capacity to repay such impounded tax funds in the event a decision ordering a refund to the taxpayer is subsequently made, the circuit court shall order, pendente lite, the disbursal of all or any part of such impounded tax funds to such taxing authority. The circuit court issuing an order under this subsection shall retain jurisdiction of such matter for further proceedings, if any, to compel restitution of such tax funds to the taxpayer. In the event that any protested tax funds refunded to a taxpayer were disbursed to a taxing authority under this subsection instead of being held and invested by the collector under subsection 7 of this section, such taxing authority shall pay the taxpayer entitled to the refund of such protested taxes the same amount of interest, as determined by the circuit court having jurisdiction in the matter, such pro-

tested taxes would have earned if they had been held and invested by the collector.

9. No appeal filed shall stay any order of refund, but the decision filed by any court of last review modifying the circuit court's or state tax commission's determination pertaining to the amount of refund shall be binding on the parties, and the decision rendered shall be complied with by the party affected by any modification within ninety days of the date of such decision. No taxpayer shall receive any interest on any additional award of refund, and the collector shall not receive any interest on any ordered return of refund in whole or in part.