Laura LANDMAN, Respondent/Cross–Appellant,

v.

ICE CREAM SPECIALTIES, INC., and Old Republic Insurance Company c/o Crawford & Company, Appellants/Cross–Respondents,

Second Injury Fund, Additional Party.

No. SC 84933.

Supreme Court of Missouri, En Banc.

June 17, 2003.

Mary A. Lindsay, St. Louis, for Respondent/Cross-Appellant.

Michael A. Gerritzen, St. Louis, for Appellants/Cross-Respondents.

Jeremiah W. (Jay) Nixon, Atty. Gen., Plia D. Cohn, Asst. Atty. Gen., St. Louis, for Additional Party.

PER CURIAM.[1]

Laura Landman and Ice Cream Specialties, Inc. (ICS) appeal two awards by the Labor and Industrial Relations Commission, one relating to a shoulder injury and one relating to a condition in Landman's legs. ICS appeals the findings that the leg condition caused Landman's permanent total disability, that ICS alone is responsible for that disability and that no liability is assessed to the Second Injury Fund. ICS also appeals the award of temporary total disability and future medical expenses relating to Landman's shoulder and the award of costs on both claims. Landman cross-appeals on the issue of costs and attorney fees.

Both awards are affirmed in part and reversed in part; one award is modified, and the other is remanded to the commission for a determination of attorney fees.

## I. FACTS

Landman worked full time as a machine operator at ICS for almost 17 years. Her duties were physically demanding. Landman continuously stood next to or on top of her machine in a cold, damp factory. She lifted 50–pound rolls of wrapper paper, climbed steep steps, carried supplies and cleaned her machine with heavy-duty hoses.

### A. Leg Problems Begin

In 1995, Landman developed a wound on her left leg and went to her family physician, Dr. Mammen. He noted a small lesion on her left shin and edema (swelling) in her left leg. A couple of months later, the lesion disappeared. In 1996, she developed another lesion on her left leg and painful swelling in both legs. The swelling continued, but the lesion again resolved within a couple of months. By November 1996, Landman's legs were in good condition, and she reported no further trouble with either leg until 1997.

### B. The 1997 Shoulder Injury and Further Problems with Leg

In July 1997, Landman fell at work and injured her left shoulder, left leg and right ankle.[2] At ICS's direction, Landman went to Barnes Hospital. The Barnes' doctors found that her left shoulder was severely bruised. She returned to work on August 6th, but could no longer handle the rolls of paper, carry supplies or lift more than 15 pounds by herself. Because of these difficulties, Landman made demands for further treatment, but ICS refused.

The Barnes' doctors had concluded that the left leg injury was not work-related, so in late August 1997, Landman went to her own physician, Dr. Mammen, for treatment of the lesion and swelling in her left leg. The lesion went away a few months later, but returned in May 1998. By September, after another flare-up in August, the condition had improved. Landman reported no further problems with lesions until February 1999.

In December 1998, Landman underwent a physical, during which the doctors found

---

1. This Court transferred this case after an opinion by the Court of Appeals, Eastern District, authored by the Honorable Glenn A. Norton. *Mo. Const. article V, section 10.*

Portions of the court of appeals opinion are incorporated without further attribution.

2. The ankle healed by August 1997 and is not an issue in this appeal.

a trace of edema and diagnosed her as obese. Otherwise, all tests were normal. Visits to the emergency room and her physician in January 1999 did not reveal any abnormalities in Landman's legs.

### C. The 1999 Injuries

In February 1999, Landman fell again at work and hit her left leg on a metal bar. She instantly developed a bruise and had severe pain. She reported the injury to ICS, but continued working until March 17, 1999. On March 18th, she went to Dr. Mammen, who noted a larger lesion in a different location than before. That day, she again reported the injury to ICS and was told to go to Barnes. She went on March 19th and was referred back to Dr. Mammen. She reported this to ICS and was told to stay off work.

A few days later, Dr. Mammen referred Landman to a general and vascular surgeon for treatment of her leg. The surgeon concluded that a contributing cause of her leg condition was venous stasis with lower leg edema, which was prolonging healing. A few days later, Dr. Mammen noted that Landman still had the large lesion on her left leg and it was draining fluid. Dr. Mammen made similar findings up through early April 1999. At the end of April, Landman was referred to a wound care center, where she was treated for several months. Unlike previous wounds that had healed within months, this lesion had still not completely healed by the time of the hearing in December 2000.

### D. Further Treatment for the 1997 Shoulder Injury

Because ICS refused to provide further treatment for her shoulder, Landman returned to Dr. Mammen. On July 14, 1999, Dr. Mammen referred her to Dr. Dusek. She did not see Dr. Dusek, however, until August 11th due to the doctor's schedule.

It was stipulated that from August 11, 1999, to March 3, 2000, Landman was temporarily and totally disabled because of the shoulder injury. She began physical therapy in October 1999.

In November 1999, Dr. Dusek believed further physical therapy would be necessary for future improvement and the ability to return to work. Landman continued with the therapy until January 2000, which resulted in some increase in strength and range of motion. But her pain level was still high. Dr. Dusek recommended surgery to relieve the pain, but he was unable to perform the surgery due to the poor healing quality of Landman's tissue. By February 2000, Dr. Dusek did not think that the shoulder would get well, but recommended that Landman continue therapy for several weeks to regain what strength and mobility she could.

ICS eventually agreed that if its orthopedic surgeon, Dr. Petkovich, found that the shoulder symptoms were work-related, it would provide treatment and temporary disability. Landman agreed that she would refrain from seeking a hardship hearing until receiving Dr. Petkovich's report. Dr. Petkovich examined Landman in February 2000 and concluded that the injury resulted from the July 1997 accident. He recommended additional surgery depending on the outcome of an MRI. Dr. Petkovich sent a copy of his report to ICS. Despite its agreement to provide treatment based on this report, ICS did not give Landman a copy of it. Even after Landman's repeated requests for the report, ICS refused to provide it.

Landman underwent additional physical therapy on her shoulder in January and March 2000, but she was discharged without achieving the desired increased range of motion and strength. On March 3, 2000, Dr. Dusek declared that Landman was at maximum medical improvement.

Landman said that because of her shoulder she could not work from July 15, 1999, through March 3, 2000.

By May 2000, ICS had still refused her requests, so Landman went directly to Dr. Petkovich for his report and, after learning his conclusions, filed a request for a hardship hearing. The issues—temporary disability and payment for treatment—were eventually resolved in mediation and stipulated to at the hearing before the administrative law judge. Eventually, ICS paid temporary total disability for the shoulder injury covering the period immediately after the accident and also for August 11, 1999, to March 3, 2000. But it refused to pay for the period July 14, 1999, through August 10, 1999 (the period between the referral to and examination by Dr. Dusek).

### E. Opinions about Leg Condition

Dr. Altsheler examined Landman and found that her legs were swollen with brawny edema. He explained that this condition develops over months or years and indicates that the legs have lost their resiliency. Dr. Altsheler opined that her wound, which had not healed, related to the February 1999 injury.

Dr. Altsheler found that venous stasis accounted for the swelling and resulting lesions in Landman's legs. By process of elimination, Dr. Altsheler believed that Landman's 17 years at ICS—moving and standing in the ways she did and in the cold damp environment—caused her condition. While he admitted she had some element of predisposition, he did not believe her obesity was a contributing factor in the development of venous stasis.

Dr. Altsheler did not know when the sequence started, but Landman's condition developed as follows: slowly, over 17 years, the cold conditions at work caused her veins to dilate, and she developed incapacity of the valves, which caused irreversible venous stasis disease. He concluded that when she developed lesions in February 1999 that would not heal, that "show[ed] a progression of the venous stasis condition up to that point." The condition has not changed since March 1999.

### F. Opinions about Shoulder Injury

Dr. Poetz examined Landman and concluded that her shoulder injury was permanent, could not be corrected with the attempted surgery, would get progressively worse and caused pain. Dr. Poetz agreed that Landman had reached maximum medical improvement, but believed that her symptoms could be modified with future treatment. He recommended physical therapy, Cox II inhibitors to relieve discomfort and reduce or slow the progression of inflammation in the shoulder, and physician visits for medication. These treatments would not increase physical ability, but they would decrease pain and provide comfort.

### G. Opinions about Nature and Extent of Disabilities

Dr. Poetz concluded that Landman's shoulder injury caused her to be temporarily and totally disabled from July 14, 1999—when she was referred by Dr. Mammen to Dr. Dusek—until March 3, 2000. Dr. Poetz opined that this injury would be a hindrance or obstacle to re-employment in the open labor market. James England, a vocational rehabilitation expert, concurred in this opinion. Both also believed that Landman's weight was a hindrance to her re-employment.

Dr. Poetz found that from March 18, 1999, to July 13, 1999, and from March 4, 2000, through July 20, 2000, Landman was temporarily and totally disabled due to her leg conditions. He and Dr. Altsheler both concluded that her leg condition had reached maximum medical improvement,

that the venous stasis is permanent and that Landman will need continued care.

Dr. Altsheler opined that Landman was permanently disabled from the leg condition alone, without considering her shoulder injury, obesity or anything else. Dr. Poetz believed Landman was unable to compete in the open labor market due to a combination of these disabilities. He considered the February 1999 injury synonymous with an occupational disease.

England also believed that the leg condition combined with the pre-existing shoulder injury and obesity resulted in Landman's permanent and total disability. But he admitted that the predominant factor was the leg condition and resulting limitations. Having to keep your legs elevated in the air, he explained, did not fit with jobs in the regular working world.

### H. Landman's Status

Landman takes Tylenol with codeine for the shoulder pain, once or twice a day, three or four days a week. Because of the venous stasis, she cannot stand or walk for very long, she cannot sit in one position very long with her legs below her hips, and she must keep her feet elevated as much as possible. She is almost completely sedentary and rarely leaves the house.

## II. PROCEDURAL HISTORY

Landman filed claims for workers' compensation on the 1997 and 1999 injuries. The 1997 claim [3] alleged that she sustained a contusion and sprained her left leg, left shoulder and right ankle when she fell at work. She also claimed that she had developed conditions in both legs due to prolonged standing at work and other work activities. She sought, among other things, future medical care, additional temporary benefits for the time between her referral to and her appointment with Dr.

Dusek, and her costs based on ICS's unreasonable defense.

The 1999 claim alleged that Landman hit her left leg on a metal bar and that due to prolonged standing at work and other work activities, she had developed conditions in her legs. She sought, among other things, permanent total disability and her costs based on ICS's unreasonable defense. Landman also asserted a claim against the fund for the 1999 injuries, alleging that she had previous injuries in 1997 and over a period of years affecting her legs, left shoulder, right ankle and "body as a whole (obesity)." ICS denied the allegations and claimed that the leg condition was not work-related.

The division of workers' compensation held one hearing on both claims. Landman testified live, and the depositions of Dr. Poetz and Dr. Altsheler were admitted into evidence, along with records and bills from Landman's other doctors and hospitals. On the 1997 claim, the administrative law judge concluded in relevant part as follows:

1) ICS is liable for additional temporary total disability from July 14, 1999, through August 10, 1999, because there was no evidence of any change in Landman's shoulder condition between the referral and the examination, at which time it was stipulated that she was unable to work.

2) ICS is liable for future medical expenses because the evidence showed that she needs future care, including attempted surgery if an MRI confirms a labral defect, and continued pain medication. The expenses are to include screening visits at least annually with an orthopedic surgeon, the MRI recommended by Dr. Petkovich, future shoulder surgery if necessary and feasible in the next three years, physical

---

**3.** Both claims were filed in 1999, but each will be referred to by the date of injury.

therapy at the discretion of the orthopedic surgeon and pain medication.

3) Under section 287.560[4] Landman may recover the cost of preparing for the hardship hearing on issues that were ultimately resolved in mediation because ICS's initial refusal to provide treatment was without reasonable grounds. Since there was no specific evidence as to that cost, other than a $600 bill for Dr. Poetz's deposition, no further amount is imposed.

On the 1999 claim, the administrative law judge concluded in relevant part as follows:

1) Landman's venous stasis is work-related, manifesting in different symptoms beginning in 1995, but not rising to the level of a known compensable condition until 1999. The evidence supported Dr. Altsheler's opinion that work was the substantial factor, and no medical opinion indicated that the condition did not result from Landman's exposure at work. Even if work was not the sole cause, it was the substantial and major factor causing the disease.

2) The accident in February 1999 did not cause the lesions or other symptoms that followed the accident. Rather, they were predominantly symptoms of venous stasis.

3) The venous stasis permanently and totally disabled Landman, and ICS is solely liable. The pre-existing shoulder injury and obesity are hindrances to re-employment in the open labor market, but the primary injury and occupational disease of venous stasis is so severe that Landman is unable to compete in the market due to that condition alone.

4) ICS did not present any expert evidence that Landman's medical condition was caused by anything other than work.

4. All statutory references are to RSMo 2000.

Therefore, raising an issue as to causation was unreasonable. Because there is no specific proof of "the whole cost of the proceedings" under section 287.560, no award of costs will be imposed.

Relying on *Reese v. Coleman*, 990 S.W.2d 195, 199–201 (Mo.App.1999), the administrative law judge also concluded that attorney fees could not be included in Landman's cost awards under section 287.560.

Landman and ICS each appealed both awards to the commission, which affirmed the awards and adopted the administrative law judge's findings and conclusions.

## III. DISCUSSION

### A. Standard of Review

■ The standard of review is that the Court will modify, reverse, remand or set aside an award only if the Commission acted without or in excess of its powers, the award was procured by fraud, the facts found by the Commission do not support the award, or there was not sufficient competent evidence in the record to warrant the making of the award. *Curry v. Ozarks Elec. Corp.*, 39 S.W.3d 494, 495 (Mo. banc 2001).

### B. Permanent Total Disability

■ ICS asserts that the commission erred in holding it wholly responsible on the 1999 claim and in failing to hold the fund liable under section 287.220.1 for Landman's permanent total disability. ICS distinguishes between the claim for the leg injury sustained when Landman fell and the claim for the occupational disease of venous stasis. It argues that the evidence shows that Landman's 1999 fall was not the sole cause of Landman's permanent and total disability. Rather, her

disability resulted from a combination of all her injuries. ICS also argues that the venous stasis constituted a previous permanent disability under section 287.220, subjecting the fund to liability.

The commission's determinations are supported by competent evidence showing that the venous stasis did not become a compensable injury until the 1999 accident and that the condition alone caused Landman's permanent and total disability.

■ Section 287.220 creates the Second Injury Fund and sets forth when and in what amounts compensation shall be paid from the fund in "[a]ll cases of permanent disability where there has been previous disability." *Section 287.220.1.* In deciding whether the fund has any liability, the first determination is the degree of disability from the last injury considered alone. *Hughey v. Chrysler Corp.,* 34 S.W.3d 845, 847 (Mo.App.2000). Accordingly, pre-existing disabilities are irrelevant until the employer's liability for the last injury is determined. *Id.* If the last injury in and of itself rendered Landman permanently and totally disabled, then the fund has no liability and ICS is responsible for the entire amount of compensation. *See id.*

Here, the commission found that the last injury was the occupational disease of venous stasis, that it was caused by work conditions, that it became a compensable injury in 1999 and that it alone caused Landman's permanent and total disability. In reaching these conclusions, the commission relied on Dr. Altsheler's opinions. There is no clear abuse of discretion in the commission's choice of this expert over the other medical opinions, and its choice will not be disturbed. *See Pulitzer Pub. Co. v. Labor and Indus. Relations Comm'n,* 596 S.W.2d 413, 417 (Mo. banc 1980). Dr. Altsheler was the only expert specializing in this type of disease. He found that the non-healing lesions Landman developed in 1999 showed the progression of her work-related condition over the past 17 years and that this condition alone caused her to be permanently and totally disabled. Dr. Poetz had different opinions, but he was a family practitioner. Likewise, England was a vocational expert and, while he had a different opinion than Dr. Altsheler, he ultimately admitted that Landman's leg condition was the predominant factor preventing her from competing in the open labor market.

■ The Court may not substitute its judgment on the evidence and may not set aside an administrative decision unless the decision is clearly contrary to the overwhelming weight of the evidence. *Pulitzer Pub. Co.,* 596 S.W.2d at 417. The commission's conclusions are supported by substantial evidence, and this Court disregards the contrary evidence. *Id.* Even considering the contrary evidence, it is not overwhelming and does not require reversal.

## C. Future Medical Costs

■ ICS also claims that the commission erred by awarding Landman her future medical costs on the 1997 claim for her shoulder injury because the evidence showed that she had reached maximum medical improvement as of the hearing and no further treatment was recommended. Landman correctly claims that there was evidence to support the need for further treatment to relieve the effects of the injury even if her condition was not expected to improve.

Future care to relieve Landman's pain should not be denied simply because she may have achieved maximum medical improvement. The statute entitles her to medical treatment as may be reasonably required "to cure and relieve from the effects of the injury." *Section 287.140.1.*

"This means treatment that gives comfort or relieves even though restoration to soundness [a cure] is beyond avail." *Sullivan v. Masters Jackson Paving Co.* 35 S.W.3d 879, 888 (Mo.App.2001) (brackets in original). Therefore, the finding that Landman has reached maximum medical improvement on her shoulder is not inconsistent with a need for future medical treatment. *See Mathia v. Contract Freighters, Inc.,* 929 S.W.2d 271, 277 (Mo. App.1996).

The commission's award of future medical treatment is supported by substantial evidence. *See Pulitzer Pub. Co.* 596 S.W.2d at 417. Dr. Poetz recommended additional physical therapy, medication to relieve pain and provide comfort and visits with physicians; Dr. Petkovich recommended surgery depending on the outcome of an additional MRI. There is nothing in Dr. Dusek's records recommending future treatment. But, viewed in the light most favorable to the award, the absence of a recommendation does not prove that Dr. Dusek affirmatively advised *against* further treatment. However the records are construed, there was no clear abuse of discretion in choosing the opinions of Dr. Poetz and Dr. Petkovich over some inference that could have been drawn from Dr. Dusek's records. *See id.* In this case, the inference is not overwhelming evidence warranting reversal.

**D. Temporary Total Disability**

■ The parties stipulated that Landman was temporarily totally disabled due to her shoulder for a short time after the 1997 accident and then again from August 11, 1999 (the date she was seen by Dr. Dusek) until March 3, 2000. ICS argues that the commission erred by awarding additional weeks of temporary total disability for the period July 14, 1999 (the date Landman was referred to Dr. Dusek) through August 10, 1999. ICS argues that this award is not supported by competent evidence, claiming Dr. Poetz's opinion as to her disability during this period was based on an unsupported assumption.

■ A claimant is capable of forming an opinion as to whether she is able to work, and her testimony alone is sufficient evidence on which to base an award of temporary total disability. *Patterson v. Engineering Evaluation Inspections, Inc.,* 913 S.W.2d 344, 347–48 (Mo.App.1995). An award is further supported where the claimant's testimony is corroborated by medical evidence and the employer has presented no evidence to refute the temporary total disability claim. *Patterson,* 913 S.W.2d at 347–48.

Here, Landman said that she could not work from July 15, 1999, to March 3, 2000, because of her shoulder. ICS did not present any contrary evidence demonstrating that Landman could work during that time. After being asked to assume the dates of the referral and examination, Dr. Poetz opined that the temporary disability began on the date of the referral. As the commission noted, there was no evidence of any change in Landman's shoulder condition between the referral and the examination. Dr. Poetz's opinion is supported by facts and reasons proven by competent evidence and has sufficient probative force to be substantial evidence. *See Silman v. William Montgomery & Associates,* 891 S.W.2d 173, 176 (Mo.App.1995).

Rather than point to contradictory evidence, ICS again asks this Court to draw inferences from the absence of information. ICS claims that because the records of Dr. Dusek and Dr. Mammen do not indicate that Landman was unable to work due to her shoulder from July 14th to August 10th, the commission should have disregarded Landman's own testimony and Dr. Poetz's opinion. Again, the absence of

information in these records is not overwhelming evidence contrary to the commission's award of temporary total disability, and the commission's reliance on other witnesses' testimony is not a clear abuse of discretion. *See Pulitzer Pub. Co.* 596 S.W.2d at 417.

### E. ICS's Unreasonable Conduct

■ ICS next contends that there was insufficient evidence to support the commission's finding that ICS defended the 1997 and 1999 claims without reasonable grounds under section 287.560. If the commission determines that "any proceedings have been brought, prosecuted or defended without reasonable ground, it may assess the whole cost of the proceedings upon the party who so brought, prosecuted or defended them." *Section 287.560.*

ICS refused to pay for treatment of Landman's shoulder until early 2000, when it agreed to pay medical bills and temporary benefits if its doctor concluded that the injury was work-related. But even after Dr. Petkovich concluded that it was a work injury, ICS did not provide Landman with his report or agree to provide treatment, which forced Landman to prepare for a hardship hearing. If ICS ever had a basis for denying treatment—of which there is no evidence in the record—there certainly were no grounds for refusing treatment once Dr. Petkovich concluded that the injury was work-related. This conduct is especially unreasonable because ICS agreed to be bound by Dr. Petkovich's conclusions, and it was on the basis of these promises that Landman did not immediately seek a hearing.

The foregoing supports the commission's finding that ICS refused treatment without reasonable grounds, and there is no overwhelming evidence to contradict the commission's conclusion.

ICS defended the 1999 claim on the ground that Landman's work conditions did not cause the venous stasis disease. As the commission's conclusions show, ICS put on no evidence to support this defense. Even now, the only evidence ICS points to is Barnes' records, which it claims concluded that the leg problems were unrelated to work. The Barnes records relating to the 1999 injury, however, do not include any such finding. The records are not overwhelming evidence that ICS had a reasonable basis for denying that the injury was work-related. The commission's conclusion that ICS's defense of this claim was without reasonable grounds is supported by the evidence. *See Stillwell v. Universal Const. Co.,* 922 S.W.2d 448, 457 (Mo. App.1996) (defense without reasonable grounds where employer offered "absolutely no ground, reasonable or otherwise" for refusing benefits clearly owed to claimant because injury was undisputedly work-related).

ICS argues that the commission erroneously focused on one aspect of its defenses in each case, rather than on its overall defense. ICS asserts that overall its defense was vigorous and reasonable, albeit unsuccessful. There is no authority requiring the commission to ignore an unreasonable aspect of a defense in light of the overall vigor with which a party defended a claim. Where the unreasonable conduct is tempered by reasonable conduct in other aspects of the defense, the remedy is not to simply deny all relief to the innocent party. Instead, the commission may exercise its discretion to order only a portion of the cost of the proceedings.

The commission should only exercise its discretion to order the cost of proceedings under section 287.560 where the issue is clear and the offense egregious. But where the commission has so exercised its discretion, the Court will defer to it absent

a lack of substantial evidence to support the award or overwhelming evidence contradicting it. *See Pulitzer Pub. Co.*, 596 S.W.2d at 417. The evidence in this case supports the commission's conclusions and is not against the overwhelming weight of any contradictory evidence.

## F. Amount of Award for Cost of Proceedings

In her cross-appeal, Landman challenges the amount of the award she was granted under section 287.560 as a result of ICS's unreasonable conduct. She argues, in part, that the cost of Dr. Poetz's deposition transcript should have been included in the 1997 award and that Dr. Altsheler's deposition fee and transcript cost should have been included in the 1999 award.

There is no direct evidence of the cost of the transcripts. Even though the transcripts themselves were in evidence and perhaps an estimation of their cost could have been calculated using a standard rate for transcription, there was no evidence of that rate. Likewise, the evidence of Dr. Altsheler's deposition fee was in the record, but only in a letter attached to his deposition transcript enclosing a check payable to the doctor for the estimated time he would spend giving his deposition. None of this is overwhelming evidence contrary to the commission's findings that there was no *specific* proof of Landman's cost of proceedings. *See Pulitzer Pub. Co.*, 596 S.W.2d at 417. This "evidence" of costs was before the commission, and this Court will not disturb the decision to discount it.

## G. Attorney Fees

Landman also contends in her cross-appeal that the commission erred in concluding that it could not include her attorney fees as part of the whole cost of the proceedings under section 287.560. Section 287.560 describes the commission's power to issue process, subpoena witnesses and other things. It also delineates how the cost of these things will be paid:

> All costs under this section shall be approved by the division and paid out of the state treasury from the fund for the support of the Missouri division of workers' compensation; provided, however, that if the division or the commission determines that any proceedings have been brought, prosecuted or defended without reasonable ground, it may assess the whole cost of the proceedings upon the party who so brought, prosecuted or defended them.

*Section 287.560.*

The primary rule of statutory construction is to ascertain the intent of the legislature from the language used, to give effect to the intent if possible, and to consider the words in their plain and ordinary meaning. The construction of statutes is not to be hyper-technical, but instead is to be reasonable and logical and to give meaning to the statutes. *Lewis v. Gibbons*, 80 S.W.3d 461, 465 (Mo. banc 2002).

It is clear that the latter part of the sentence authorizing assessment of "the whole cost of the proceedings" against a party is an exception to the general rule that all costs are paid for by the state because the second part of the sentence begins with the phrase "provided, however." *Section 287.560.* So, costs are to be paid out of the state fund, except when a party has asserted or defended a claim on unreasonable grounds. In those cases, the offending party is to be charged.

There is a difference between the phrases "all costs under this section" and "the whole cost of the proceedings." When different terms are used in different

subsections of a statute, it is presumed that the legislature intended the terms to have different meaning and effect. *Armco Steel v. City of Kansas City, Mo.*, 883 S.W.2d 3, 7 (Mo. banc 1994). It is logical to follow that presumption here—"all costs under this section" plainly refers to all the costs that the commission may authorize under section 287.560, for things like the issuance of subpoenas and deposition transcripts. "[T]he whole cost of the proceedings," on the other hand, is plainly broader than just those costs that are identified in "this section." Otherwise, the words "whole" and "of the proceedings" would be rendered superfluous and without meaning.

■ It is presumed that the legislature intended that every word, clause, sentence, and provision of a statute have effect. Conversely, it will be presumed that the legislature did not insert idle verbiage or superfluous language in a statute. *Hyde Park Housing Partnership v. Director of Revenue*, 850 S.W.2d 82, 84 (Mo. banc 1993). "[T]he whole cost of the proceedings" is not limited to just those costs listed in section 287.560. In fact, "the whole cost of the proceedings" must include everything the innocent party expended in the proceeding "brought, prosecuted or defended without reasonable grounds," including her attorney fees.

This broad reading of the statute is consistent with *P.M. v. Metromedia Steakhouses Co., Inc.*, 931 S.W.2d 846 (Mo.App. 1996). Under section 287.203, when an employer terminates payment of compensation, the employee is entitled to a hearing if she disputes the termination. "Reasonable cost of recovery shall be awarded to the prevailing party." *Section 287.203.* In *P.M.*, attorney fees were found to be part of the "cost of recovery." 931 S.W.2d at 849. The court found that on its face the phrase "cost of recovery" contemplates an award of attorney fees, "since legal fees are unquestionably the largest cost incurred when an employee is forced to sue to recover a Worker's Compensation award." *Id.*

This reasoning is equally applicable to the phrase "the whole cost of the proceedings." Since attorney fees are the bulk of the cost anyone expends in a proceeding, this sanction would have no teeth if it did not encompass legal fees. Such a narrow interpretation would defeat the purpose of this provision to discourage parties from pursuing or defending claims without reasonable grounds. A narrow reading may also discourage employees from pursuing or continuing to pursue legitimate claims in the face of unreasonable defense tactics by employers. The risk of incurring attorney fees may cause legitimate claimants to drop their claims in these situations. This also would be contrary to the overall purpose of the workers' compensation law—to make industry bear the burden of compensating employees for losses from work-related injuries. *See Campbell v. Citicorp Mortg., Inc.*, 924 S.W.2d 323, 324 (Mo.App. 1996). "The system was enacted to provide quick recovery to those who were injured without their incurring the cost and delay associated with litigation." *McCormack v. Stewart Enterprises, Inc.*, 916 S.W.2d 219, 226 (Mo.App.1995). Making the sanction for pursuing or defending a claim without reasonable grounds meaningful by including attorney fees furthers this goal.

To the extent *Reese v. Coleman*, 990 S.W.2d 195 (Mo.App.1999), is to the contrary, it is overruled.

The record is sufficient to determine the amount of attorney fees to award as to part of the claim. *See Rule 84.14.* On the 1999 award, the 25% lien Landman's counsel was granted on the award is sufficient evidence of the amount Landman incurred in attorney fees relating to the proceeding

to obtain benefits for her leg condition. Contrary to ICS's assertion, this is a reasonable amount, given that 25% is the standard fee in workers' compensation cases. *See P.M.*, 931 S.W.2d at 850 n. 3. Thus, ICS should pay Landman $8,795.87 (25% of $ 35,183.48, the total compensation on the 1999 claim).

There is not sufficient evidence, however, to modify the cost award on the 1997 claim. On that claim, Landman may receive the whole cost of the hardship hearing, since that is the particular proceeding in which ICS was found to have defended a claim without reasonable ground. *See section 287.560*. While the 25% lien represents the total amount of her attorney fees relating to the 1997 claim, there is no evidence indicating what percentage of those fees related to preparation for the hardship hearing. Therefore, the 1997 award must be remanded to the commission. On remand, the commission may, but it is not required to, take such additional evidence as it believes will assist it in making its award determination. *Baxi v. United Technologies Automotive*, 956 S.W.2d 340, 344 (Mo.App.1997).

## IV. CONCLUSION

The commission's conclusion that attorney fees are not authorized as part of the whole cost of the proceedings under section 287.560 is reversed. The 1999 award is modified to include an order directing ICS to pay Landman an additional $8,795.87. The 1997 award is remanded to the commission for a determination of the amount of attorney fees relating to the hardship hearing that ICS should pay Landman. In all other respects, the commission's awards are affirmed.

All concur.