Kathleen **ELMORE,** Claimant– Appellant,

v.

**MISSOURI STATE TREASURER AS CUSTODIAN OF the SECOND INJURY FUND, Respondent.**

No. SD 30906.

Missouri Court of Appeals, Southern District, Division One.

July 22, 2011.

Application for Transfer Denied Oct. 4, 2011.

Randy Charles Alberhasky, Springfield, MO, for Appellant.

Chris Koster, Attorney General, and Cara Lee Harris, Assistant Attorney General, Springfield, MO, for Respondent.

DON E. BURRELL, Judge.

Kathleen Elmore ("Claimant") sought permanent total disability benefits from the Treasurer of the State of Missouri as Custodian for the Second Injury Fund ("the Fund") after she incurred a hand injury while working as a hospital nurse.[1]

1. In her brief, Claimant refers to her compensable injury as an "occupational disease" on two occasions but more often as an "occupational injury." She refers to the affected part of the body at different times as the "hand," "wrist," and "thumb." The award refer- enced the "right arm at the 175–week level," which is a reference to the amount awarded for an injury to the hand, and Claimant does not contest this. Section 287.190.1(5). Unless otherwise indicated, all statutory references are to RSMo 2000. For purposes of

The Fund is implicated because no one disputes that Claimant's hand injury combined with her pre-existing fibromyalgia and back disabilities produced a greater degree of disability than that caused by her hand injury alone.

■ An Administrative Law Judge ("ALJ") determined that Claimant's combined disability was 10 percent greater to her body as a whole than just the percentage of disability resulting from the simple addition of her occupational injury to her pre-existing back and fibromyalgia disabilities and ordered the Fund to pay Claimant $13,882 as permanent *partial* disability benefits (emphasis added). The Labor and Industrial Relations Commission ("the Commission") affirmed the decision of the ALJ and adopted it as its own. When the Commission attaches and incorporates by reference the ALJ's award and decision, we "consider[ ] the findings and conclusions of the Commission as including the ALJ's award." *Henley v. Fair Grove R–10 Sch. Dist.*, 253 S.W.3d 115, 126 (Mo. App. S.D.2008).

Claimant now appeals, asserting in two points relied on that the Commission erred as a matter of law in rejecting her claim that she was permanently and totally disabled because Claimant's expert was more credible as a matter of law than the witnesses relied on by the Commission and that Claimant's "preexisting disabilities should have been evaluated under § 287.220.1 as of when her injury became compensable"—either when she missed work in February 2004 or when she reached "maximum medical improvement" in November 2005—instead of when she first reported her injury to Employer. Finding no merit in her first claim, and finding that using Claimant's suggested alternate injury dates would make no dif-

ference in the result, we affirm the decision of the Commission.

## Standard of Review

■ We must affirm the decision of the Commission unless it "acted in excess of its powers, the award was procured by fraud, the facts found by the Commission do not support the award, or there was not sufficient competent evidence in the record to warrant making the award." *Clayton v. Langco Tool & Plastics, Inc.*, 221 S.W.3d 490, 491 (Mo.App. S.D.2007); section 287.495.1. "Whether the award is supported by competent and substantial evidence is judged by examining the evidence in the context of the whole record." *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 223 (Mo. banc 2003). We defer to the Commission on "determinations regarding weight of the evidence and the credibility of witnesses," *Silman v. Simmons' Grocery & Hardware, Inc.*, 204 S.W.3d 754, 755 (Mo.App. S.D.2006), but we review questions of law *de novo*. *Ullum v. George Carden Circus Int'l Inc.*, 223 S.W.3d 192, 195 (Mo.App. S.D.2007).

## Facts

Claimant became a registered nurse in 1981 and worked in a hospital obstetrics unit for over twenty years. In 1999, she underwent back surgery but continued to have back problems. In 2000, Claimant was diagnosed as having fibromyalgia. By 2002, she was using a variety of pain-relief methods and trying to schedule herself so that she did not have to work more than two days back-to-back.

In August 2003, Claimant began experiencing problems with her right hand. She alerted her employer, Cox Health Systems ("Employer"), which referred her to a doc-

---

simplicity, we will refer to her claim as an occupational injury to the hand except when referencing a specific procedure or diagnosis referred to by an expert witness.

tor who then referred her to orthopedic surgeon Scott Swango. Dr. Swango's medical records, which were admitted into evidence, indicated that he first tried treating Claimant with injections of "Kenalog" and "plain lidocaine." When the injections did not provide relief, he operated on Claimant's hand in February 2004 and again in July 2004, after still another Kenalog injection had failed to produce any positive results. Dr. Swango released Claimant to return to work in October 2004, and his medical report stated that he did not think Claimant's thumb injury had disabled her; he believed Claimant was still "employable" and "should be able to do some type of nursing function)." After Dr. Swango had performed the two surgeries on Claimant's thumb, Claimant was apparently examined in October 2004 by her "primary doctor," Dr. Drew Shoemaker.

Claimant continued experiencing pain and sought the help of another physician, Dr. Michael Grillot. Dr. Grillot operated on Claimant's thumb in March 2005. Claimant was released from Dr. Grillot's care, but her hand continued to be weak and stiff. Claimant testified that her back pain and fibromyalgia worsened after developing problems with her hand. Claimant acknowledged that while she preferred working three twelve-hour shifts per week (scheduled so that she did not work any three of them in a row), she was at times working up to fifty hours per week until 2003. Claimant worked up until her first surgery in February 2004, but she did not return to work thereafter.

Claimant testified that after being released by Dr. Swango, she showed Employer the condition of her hand and Employer was unable to offer alternative work to the nursing position. At the hearing, Claimant testified that as of when she stopped working, she "could not scrub into the surgical procedure[,]" a duty normally required of a nurse in her position. Claimant is able to use her computer at home to send emails and search the Internet. She is also capable of engaging in some recreational activities. In September 2008, Claimant took a camping trip with her daughter and granddaughters that included two nights in a tent and two nights in a hotel.

During the course of pursuing her workers' compensation claim against Employer, Claimant was examined on two occasions at the request of her attorney by Dr. David George Paff. Claimant eventually settled her workers' compensation claim involving the occupational injury to her hand with Employer and agreed in that settlement that the disability to her hand was 33 and 1/8 percent. The "Stipulation for Compromise Settlement" was received as Claimant's Exhibit Q at the hearing. It stated that "[t]he permanent partial disability settlement of 33 1/8% to the right hand represents a compromise between Dr. Paff's rating of 35% to the right hand and Dr. Lennard's 20% rating to the right hand."

Claimant sought an evaluation by Dr. Paff. Dr. Paff testified by deposition that he saw Claimant in November 2005 and again in July 2008. Dr. Paff based his assessments on his physical examination of Claimant, her expressed complaints, and the treatment she had received. He determined that Claimant's problems with her back and fibromyalgia predated her occupational injury. Dr. Paff testified that he did not believe Claimant could return to the same job she had when she began experiencing problems with her hand because it required that she use "the computer and the mouse six hours a day."

When Dr. Paff prepared his first report in November 2005, he stated that Claimant's hand had reached "maximum medical

improvement." Dr. Paff eventually assigned the following permanent partial disability ratings to Claimant: 35 percent for the "right upper extremity carpometacarpal joint," 15 percent to the whole body for her lumbar spine condition, and 10 percent to the whole body as a result of her fibromyalgia. Dr. Paff testified that he assessed a greater overall disability of 10 percent for Claimant when her occupational injury was considered in combination with her back and fibromyalgia disabilities.

Claimant's vocational expert, Phillip A. Eldred, testified by deposition regarding his assessment of Claimant, and his written report was included without objection as Exhibit 2. Eldred reviewed and assessed the assessments of other professionals regarding Claimant's ability to work as follows:

Nancy Dickey was the first one that I looked at. She's a physical therapist. And her restrictions are sedentary work level.

Dr. Swango, from what he stated in his evaluation, he didn't give any restrictions. He just mentioned he thought she was employable and she would be able to do some type of nursing, but he didn't elaborate on that.

Dr. Shoemaker gave restrictions of less than a sedentary work level. Dr. Lennard, his restrictions were undefined, even though he gave a percentage of disability. Dr. Paff listed her at sedentary work level.

Eldred summarized portions of the medical records he reviewed, but the complete reports and records made by the cited professionals were not included as a part of Eldred's report or as exhibits to his

deposition.[2] Eldred attributed the following statement to Dr. Shoemaker:

"Has had surgery right hand and cannot grip post operatively. She is right handed. Can't write only intermittently, cannot open jars, can't assist in surgery due to hand limitations. Also has chronic back pain and fibromyalgia which further disable her." (Q: 7a: If medical leave is required for the employee's absence from work because of the employee's own condition ... is the employee unable to perform work of any kind?) [sic] Yes." [sic]

Eldred then looked at the specific physical restrictions stated by the other professionals, including Dr. Shoemaker; identified the sedentary-type jobs available in the economy; and considered whether Claimant could perform those jobs based on her physical restrictions, mental abilities, level of pain, and some testing she had completed. Eldred opined that Claimant was not employable in the open labor market, and his report concluded that Claimant is "permanently and totally disabled as a result of her injury on October 27, 2003[,] combined with her pre-existing medical conditions."

Eldred acknowledged there were jobs Claimant could perform based upon just the occupational injury to her hand because there are jobs that may be done using only one hand. Further, Eldred conceded that the work Claimant was actually doing at the hospital was classified as a medium-level job involving lifting, carrying, pushing 20–to–50 pounds and sometimes more. He also admitted that Dr. Shoemaker's restrictions for Claimant were based on his evaluation of Claimant

**2.** Claimant's counsel insisted at oral argument that all of these underlying records were substantively "in evidence" because they were records of a type an expert witness may reasonably rely on in formulating his opinions. How the fact-finder would review and weigh this evidence without its actually having been presented at trial is unclear.

before she had finished treatment with her own surgeon, Dr. Grillot.

The Fund's vocational expert, rehabilitation counselor James England, reviewed Claimant's file and also provided an opinion as to her employability. In performing his work, England reviewed the depositions of Claimant and Dr. Paff, considered the medical records that were provided to him, and reviewed Claimant's limitations as expressed by Drs. Lennard and Paff. England's opinion of Claimant's employability was as follows:

> Well, I think that looking at the opinions of either of those doctors [Lennard and Paff], I think that she would still be employable in a variety of, I would call them, alternative nursing settings, as well as things not related to nursing. But I think rather than going with just entry-level employment, like being a receptionist or security guard, or something like that, I think it would make more sense for her to stay within the medical field. I felt some of the possibilities would include being an office manager for a medical service company, and that would be companies, for instance, that send out people to do home-health nursing. You have someone who coordinates that activity at the office. I think she would be ideal for that. I think she could do utilization review, medical records review, work for, for instance, insurance companies, attorneys, things of that nature; and I think with her background, you know, it would be practical for her to use that knowledge and skill in jobs that would be within the physical restrictions. I think if she indeed has these limitations with her right hand, there is adaptive equipment, such as either a voice-activated computer or a one-handed keyboard, either one, that could be utilized to circumvent the problems that she has with her right hand, and it would still enable

her to go back and function in these types of job settings.

England's report was included with his deposition as Exhibit 2, and it stated: "Someone with [Claimant's] background is, in my opinion, highly marketable if one considers her overall work background, experience, training and considering the restrictions recommended by the doctors. I certainly saw no medical evidence that would lead me to believe that she is totally disabled from all forms of employment."

The Commission specifically found that the opinions of England and Dr. Paff more persuasive than the opinion of Eldred.

## Analysis

### Point I: Credibility "as a Matter of Law"

■ Claimant's first point claims the Commission erred *as a matter of law* in finding England more credible than Eldred. (Emphasis added.) Specifically, Claimant contends:

> The Commission erred as a matter of law in determining that vocational expert Phil Eldred was less credible than vocational expert James England, based upon the finding that Eldred relied on restrictions imposed by Dr. Shoemaker on October 25, 2004, as set out in Eldred's report, because the October 25, 2004 record from Dr. Shoemaker was not admitted into evidence in original form, but rather as copied by Phil Eldred.

As between Eldred and England, the Commission's adopted findings of the ALJ were:

> I also find more persuasive the opinions of Mr. England, who I find to be more persuasive than Mr. Eldred because Mr. England applies the restrictions of Dr. Paff which are in evidence as opposed to

Mr. Eldred who bases his opinion in part upon the restrictions [in] Dr. Shumaker's [sic] report which is not in evidence and *was made before [C]laimant's last surgery.*

(Emphasis added.)

■ In light of this resolution by the Commission of the conflicting testimony, by the Commission, Claimant has drafted her point to assert what purports to be a purely legal claim in an attempt to avoid our application of the following legal principle:

> When resolution of an issue in a workers' compensation case hinges on the credibility of witnesses, or the weight to be given to certain evidence, the scope of appellate review is significantly curtailed. *Cochran v. Indus. Fuels & Resources, Inc.,* 995 S.W.2d 489, 495[15] (Mo.App.1999). This follows because the weight to be given evidence rests with the Commission and it alone determines the credibility of witnesses.

*Lockman v. Citizen's Mem'l Hosp.,* 140 S.W.3d 214, 218 (Mo.App. S.D.2004).

If one witness may be considered more credible than another as a matter of law, then we could potentially review the Commission's finding *de novo* instead of determining whether its decision was against the overwhelming weight of the evidence or was not supported by competent and substantial evidence in view of the whole record. *See Hampton,* 121 S.W.3d at 222.

While Claimant cites authority for the proposition that an appellate court examines an issue of law as if it were the original court, *Ransburg v. Great Plains Drilling,* 22 S.W.3d 726, 730 (Mo.App.

W.D.2000), *overruled on other grounds by Hampton,* 121 S.W.3d at 223–24, she points to no authority holding that the Commission's decision on the weight to give the testimony of expert witnesses is a legal issue. Instead, Claimant contends the medical information her preferred expert relied upon was also "actually admitted into evidence *without objection* [ ] as set out in Eldred's report"; points to section 490.065.3 as empowering an expert to rely upon such information not otherwise admitted into evidence as a basis for his opinion if that information otherwise comports with the requirements of the expert witness statute; and argues that this means the Commission could not—as a matter of law—find Eldred less credible than England on the grounds that Eldred had relied on information that was not in evidence. (Emphasis as stated in original.) In making this argument, Claimant also disregards the Commission's accompanying statement that Dr. Shoemaker's report was generated before Claimant underwent her final surgery.

■ The Fund agrees that section 490.065 [3] applies to contested administrative cases. *See State Bd. of Registration for the Healing Arts v. McDonagh,* 123 S.W.3d 146, 154–55 (Mo. banc 2003). It is also true that the proper interpretation of section 490.065 is a matter of law we review *de novo* and that evidence should be admitted when it meets the requirements set forth therein. *Kivland v. Columbia Orthopaedic Grp., LLP,* 331 S.W.3d 299, 311 (Mo. banc 2011). But section 490.065 does not address what (if any) weight the fact-finder must give that admissible evidence. In other words, the statute does

---

**3.** In pertinent part, the statute provides:
The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing and

must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable.
Section 490.065.3.

not require that the fact-finder fully accept the expert's opinion above other evidence. Nor does it require that the substance of an expert's testimony be weighed anew by a reviewing court.

Here, there is no suggestion that the ALJ rejected Eldred's testimony or report on the grounds that it failed to satisfy the foundational requirements of section 490.065.3. As Claimant concedes in her brief, "Eldred's report was submitted into evidence without objection." Further, Eldred's deposition testimony (Exhibit W) was also received into evidence without objection. The Commission made no statement indicating that Eldred's testimony or report could not be considered. Instead, the Commission summarized Eldred's evaluation and listed the doctors he relied upon in reaching his opinion. The Commission's findings were that two of the reports relied on by Eldred, one from "Dr. Shumaker" [sic] and the other from Dr. Lennard, were not independently admitted into evidence but that the restrictions endorsed by those doctors were "referenced in the record through the assessment of [Eldred]." Its findings go on to discuss Eldred's opinion in some detail, but the Commission could review only the portions of Dr. Shoemaker's observations and findings that were actually placed before it in the second-hand form of Eldred's report and testimony.[4]

■■■■ In the end, the portions of Dr. Shoemaker's opinions cited by Eldred in his report were not that helpful to Claimant.

In order to be entitled to Fund liability, the claimant must establish either that (1) a preexisting partial disability combined with a disability from a subsequent injury to create permanent and total disability or (2) the two disabilities combined to result in a greater disability than that which would have resulted from the last injury by itself.

*Gassen v. Lienbengood,* 134 S.W.3d 75, 79 (Mo.App. W.D.2004). Even though Dr. Shoemaker opined that Claimant could not work in October 2004 and Eldred rated Dr. Shoemaker's work restrictions at "less than a sedentary work level[,]" Dr. Shoemaker is not quoted as stating that Claimant was permanently totally disabled (as opposed to temporarily totally disabled). Further, assuming Dr. Shoemaker believed that Claimant's condition was permanent, it is not clear whether he believed that the addition of the occupational injury caused permanent total disability or whether her worsening, pre-existing back and fibromyalgia disabilities in themselves caused that permanent total disability. The distinction is important because the Fund is not liable for disability caused by prior conditions or disability caused by a worsening prior condition. *Lawrence v. Joplin R–VIII Sch. Dist.,* 834 S.W.2d 789, 793 (Mo.App. S.D.1992); *Elrod v. Treasurer of Missouri as Custodian of the Second Injury Fund,* 138 S.W.3d 714, 717 (Mo. banc 2004). And, in terms of partial permanent disability, Eldred does not quote Dr. Shoemaker as giving any percentage of greater disability attributable to the combination of Claimant's pre-existing dis-

---

4. Claimant "has the burden of proving all elements of [her] claim to a reasonable probability [,]" *Dunn v. Treasurer of Missouri as Custodian of Second Injury Fund,* 272 S.W.3d 267, 272 (Mo.App. E.D.2008), and if she had wanted to offer Dr. Shoemaker's records, she could have done so by calling him as a witness or otherwise qualifying them for admission. *See, e.g., Care & Treatment of T.D. v. State,* 199 S.W.3d 223, 228 n. 4 (Mo.App. S.D.2006) (business records rule a possible exception to hearsay prohibition if records are properly qualified); *see also* section 490.680.

abilities and her occupational injury.[5] *See Highley v. Von Weise Gear,* 247 S.W.3d 52, 55 (Mo.App. E.D.2008).

 Contrary to Claimant's arguments, Eldred's testimony and report were not ignored by the Commission and section 490.065.3 does not compel a *de novo* review of the Commission's weighing of the competing expert opinions. What Claimant asks us to do is to step outside the well-established role of an appellate court. As earlier noted,

> on issues involving the credibility of witnesses and the proper weight to be given their testimony, we defer to the Commission. *Birdsong v. Waste Mgmt.,* 147 S.W.3d 132, 137 (Mo.App.2004); *see also Clark[ v. FAG Bearings Corp.],* 134 S.W.3d [730] at 735 [ (2004) ]. Additionally, "[w]hen witnesses are deposed and do not testify live before the ALJ, the Commission is just as able as the ALJ to determine credibility from the written record." *Birdsong,* 147 S.W.3d at 137–38. "In situations where witnesses are deposed and do not testify live before the ALJ, this [C]ourt defers to the Commission on matters such as witness credibility, as the Commission is just as able as the ALJ to determine credibility from the written record." *Aldridge v. S. Missouri Gas Co.,* 131 S.W.3d 876, 880 (Mo.App.2004).

*Russell v. Invensys Cooking & Refrigeration,* 174 S.W.3d 15, 23 (Mo.App. S.D. 2005).

 Our proper role is to consider the evidence in support of the Commission's award in the context of the whole record. "The test for permanent, total disability is the worker's ability to compete in the open labor market. The critical question is whether, in the ordinary course of business, any employer reasonably would be expected to hire the injured worker, given his present physical condition." *ABB Power T & D Co. v. Kempker,* 236 S.W.3d 43, 48 (Mo.App. W.D.2007) (citation and footnote omitted). When conflicting expert opinions are offered, it is the job of the Commission to reconcile the evidence and make a determination of fact. *Custer v. Hartford Ins., Co.,* 174 S.W.3d 602, 617 (Mo.App. W.D.2005).

 Claimant also asserts that "[d]isregarding Dr. Shoemaker's opinions regarding the back and fibromyalgia while recognizing Dr. Lennard's [opinions] is capricious, illogical and contrary to law." The Commission referenced Eldred's reliance on Dr. Lennard's reports as one of the bases for his opinion, and noted that Dr. Lennard's report was made after Claimant had undergone her final surgery by Dr. Grillot. The Commission also referred to Dr. Lennard's rating of 20 percent disability to the hand in the context of Claimant's settlement with Employer. The ALJ-approved settlement was received into evidence as Exhibit Q. Claimant had already accepted a compromise on a 33 1/8 percent partial permanent disability rating for her hand based in part on a lower rating provided by Dr. Lennard, and it was not capricious, illogical, or contrary to law for those facts to be noted in the Commission's findings.

Claimant also asserts that "Dr. Paff never rendered an opinion that [Claimant] could work[,]" and the Commission "misinterpreted the significance of Dr. Paff's testimony."[6] Dr. Paff saw Claimant on two

---

**5.** As a vocational expert—not a physician—Eldred could not and did not quantify any disability greater than the sum of Claimant's prior disabilities and her work injury. *See*

section 287.190.6(1) and (2), RSMo Cum. Supp.2006.

**6.** Claimant's use of the word "significance" is, in itself, significant; it suggests an implicit

separate occasions, approximately two-and-a-half years apart, with the last visit being in July 2008. Dr. Paff did not think that Claimant could return to her original job at the hospital, but as counsel for the Fund points out, Dr. Paff never opined that Claimant was permanently totally disabled. Dr. Paff stated that Claimant's hand had reached "maximum medical improvement" in November 2005, that her back and fibromyalgia conditions predated her work injury, and that these disabilities combined with the work injury to exponentially increase her overall disability, but only by 10 percent to the body as a whole.

Dr. Paff's assignment of a permanent partial disability rating of 35 percent for the right thumb remained consistent in his reports from both evaluations. He then added ratings to the body as a whole of 15 percent for the lumbar spine and 10 percent for fibromyalgia in his second report. Taken together, these ratings do not suggest that Dr. Paff viewed Claimant as permanently and totally disabled.

In her reply brief, Claimant notes that Dr. Paff did not testify as to Claimant's employability in the labor market. But the Commission, given the testimony of England and Eldred, was not without evidence on this issue. England testified that there were jobs in the labor market, including jobs superior to entry-level positions, that matched Claimant's skills and physical restrictions. England considered someone like Claimant to be "highly marketable" and he "certainly saw no medical evidence that would lead [him] to believe that she is totally disabled from all forms of employment."

The Commission did not err as a matter of law in finding the testimony from England and Dr. Paff more persuasive than that of Eldred. Point I is denied.

understanding that the issue is one of weight, not admissibility, and it belies her claim that

## Point II: Date of the Injury

Claimant's second point alleges the Commission erred as a matter of law in considering her pre-existing disabilities as of Fall 2003 (when problems with her hand first manifested) because her occupational injury did not become compensable until she missed work for surgery in February 2004 and her "maximum medical improvement" was not attained until November 2005. As Claimant points out, the Fund's liability for additional disability is determined according to section 287.220.1, which includes the following direction:

> [T]he degree or percentage of disability which existed prior to the last injury plus the disability resulting from the last injury, if any, considered alone, shall be deducted from the combined disability, and compensation for the balance, if any, shall be paid out of a special fund known as the second injury fund, hereinafter provided for.

Claimant cites *Landman v. Ice Cream Specialties, Inc.* 107 S.W.3d 240, 248 (Mo. banc 2003), *overruled on other grounds by Hampton*, 121 S.W.3d at 223–24, as support for her argument that the date of injury is not when symptoms first arise but when the injury becomes compensable. Counsel for the Fund distinguishes *Landman* because the employee there did not claim an earlier date as the applicable date of injury. Here, Claimant specifically listed October 27, 2003, as her date of injury, both on her workers' compensation claim form and then as confirmed by her counsel at the evidentiary hearing on her claim against the Fund. Claimant also agreed in her settlement with Employer that she "sustained an inju-

one expert's opinion may be more or less credible than another's as a matter of law.

ry arising out of and in the course of employment" "on or about 10–27–03[.]"

An occupational disease does not become a compensable injury until the disease causes the employee to become disabled by affecting the employee's ability to perform his ordinary tasks and harming his earning ability. An employee can be diagnosed with an occupational disease and experience symptoms of the disease prior to the time that it becomes disabling.

*Garrone v. Treasurer of the State of Missouri,* 157 S.W.3d 237, 242 (Mo.App. E.D.2004) (internal citations omitted). Further, the date Claimant entered on her claim form and the date she used in her settlement with Employer are not necessarily determinative of the date of compensable injury because the former dates may relate to causation (or the employer's exposure to liability) rather than the Fund's obligation to compensate for additional disability suffered as a result of the combination of a new occupational injury and a pre-existing disability. *Id.* at 243–44.

Thus, the record supports Claimant's claim that her compensable injury occurred in February 2004, not on October 27, 2003. But there is no need for us to determine whether Claimant should be barred from asserting a different date of injury on appeal from the one she claimed at her hearing before the ALJ because a change of her date of injury to either of the dates she now suggests would make no difference in the outcome.[7] Moving the date of injury to February 2004 does noth-

ing more than provide Claimant the ability to reargue the weight of Dr. Shoemaker's opinions. Claimant asserts that "the Commission erred in not weighing in Dr. Shoemaker's nearly contemporaneous opinions, as utilized by Eldred in his vocational exam, especially since they were admitted into evidence without objection as documented in Eldred's report[.]" (Emphasis added.) Setting the date of compensable injury closer to the date of Dr. Shoemaker's examination and report does not make his opinions and the opinions of Eldred superior as a matter of law to those of England and Dr. Paff As set forth in our analysis of Point I, it is the prerogative of the Commission to assess credibility and weigh evidence. *Lockman,* 140 S.W.3d at 218. Point Two is also denied.

Claimant has failed to demonstrate that she is entitled to relief under any of the four, exclusive grounds set forth in section 287.495.1. The award of the Commission is affirmed.

BARNEY, P.J., and FRANCIS, J., Concur.

---

7. The date calendared for the occupational injury does not determine the compensation rate. The parties agreed that the weekly partial permanent disability rate was $347.05 and the total permanent disability rate was $662.55. The Commission utilized 40 weeks (representing 10 percent of 400 weeks) in calculating the award. *See* section 287.190.3 (setting the maximum allowable period of weeks at 400). Had the Commission found that Claimant was permanently and totally disabled, then the actual calculation of benefits—both lump sum and weekly—would have been different, of course, but if anything, moving the date of compensable injury forward in time could have postponed the start of weekly benefits.