**CORRECTED**
**JULY 30, 2019**



# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| DAVID CHENEY (DECEASED), | ) | |
| DONNA CHENEY, SPOUSE, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD81939 |
| | ) | |
| CITY OF GLADSTONE, | ) | Opinion filed: June 4, 2019 |
| | ) | |
| Appellant. | ) | |

## APPEAL FROM THE LABOR AND INDUSTRIAL RELATIONS COMMISSION

Before Division Three: Thomas H. Newton, Presiding Judge,
Anthony Rex Gabbert, Judge and Edward R. Ardini, Jr., Judge

The City of Gladstone ("the City") appeals the judgment of the Labor and Industrial

Relations Commission ("Commission") granting death and burial benefits under Missouri's

Workers' Compensation Act to Donna Cheney on behalf of her deceased spouse, David Cheney.

The Commission determined that David Cheney suffered a compensable injury by occupational

disease arising out of and in the course of his employment as a firefighter with the City. We affirm.

## Factual and Procedural Background

In 1981, David Cheney and Donna Cheney were married. That same year, David Cheney

attended the police academy and became a police officer. David Cheney began working for the

City of Gladstone as a public safety officer a year later. At the outset of his employment with the

City, he served as both a police officer and firefighter. In the early 1990s, the departments split, and David Cheney worked exclusively as a firefighter.

In 2008, after a nearly 28-year career as a firefighter, David Cheney, at age 48, was diagnosed with follicular non-Hodgkin's lymphoma ("NHL").[1] David Cheney immediately began treatment and was not actively employed thereafter. Following his diagnosis, David Cheney filed his claim for workers' compensation benefits, alleging that his NHL was caused by his work as a firefighter, during which he was exposed "to smoke, gases, carcinogens, and inadequate oxygen." In 2009, David Cheney retired from the City as a fire captain and continued receiving treatment until his death on May 22, 2014. Following David Cheney's death, Donna Cheney was substituted as the claimant in this case. A final hearing on the claim was held on February 2, 2017.

At the hearing,[2] Donna Cheney and two of David Cheney's former colleagues, Kenneth Potter and David Cline, testified. Another former colleague, David Rierson, testified by deposition. The parties also submitted exhibits and other deposition testimony, including testimony and reports from medical experts.

*Firefighter witness testimony*

Kenneth Potter worked for the City, including as a public safety officer and firefighter, from 1983 to 2011. David Rierson was employed by the City as a public safety officer, paramedic, and firefighter from 1989 through 2008, and worked with David Cheney "pretty much exclusively on the same shift" for nearly 15 years. When David Cheney, Potter, and Rierson started with the City in the 1980s, they worked both as police officers and firefighters. Shifts for firefighters were

---

[1] NHL is "a type of tumor in the blood" and "a form of cancer involving the hematopoietic system."

[2] The parties stipulated that David Cheney was an employee of the City at the time of his diagnosis, that the City was subject to Missouri's workers' compensation law, that the City was fully insured, and that David Cheney timely filed his claim and gave proper notice to the City of the alleged occupational disease.

24 hours on, 48 hours off. Police officers worked eight-hour shifts. In the early 90s, the departments split, and Potter, Rierson, and David Cheney then worked exclusively for the fire department. David Cline worked for the City as a firefighter and paramedic from 1996 until 2003. While he was with the City, he worked with and was trained by Potter, Rierson and David Cheney. Potter, Rierson, and Cline provided testimony explaining their duties and experiences working with David Cheney as firefighters for the City.

When the four men began working for the City, they were each issued one set of firefighting gear. They were also provided a self-contained breathing apparatus ("SCBA"). The SCBAs were very heavy and restrictive, so the firefighters typically only wore them while actively suppressing a fire. The firefighters did not wear the SCBAs during the ventilation[3] or overhaul phases,[4] even though they would encounter smoldering materials, including household chemicals, plastics, insulation, and electronics, during those stages. In the mid-1990s, the City instituted a policy requiring that firefighters wear their SCBAs during the overhaul phase when the carbon monoxide levels were above 50 parts per million. The detectors used to determine the amount of carbon monoxide did not test for the presence or levels of other fumes or gasses. Firefighters did not wear their SCBAs if the carbon monoxide level was under 50 parts per million, even if some carbon monoxide was detected.

Potter, Rierson, and Cline described how, while fighting fires, particulates from the smoke would adhere to their gear and SCBAs. This black soot would also amass on the firefighters' skin and around their eyes, nose, ears, and mouth. Potter and Cline testified that they often saw black

---

[3] During the ventilation phase of firefighting, the firefighters would break out windows and cut holes in the roof of a structure to vent out excess smoke.

[4] During the overhaul phase, firefighters searched for hot spots or buried fires and extinguished them.

3

soot on David Cheney's face following a fire call. All three firefighters stated that it was common for firefighters to expel black mucous from their nose for several days after a fire.

The firefighters rarely washed their gear at the station but would spray it off with a hose at the firehouse when it became covered with insulation or other heavy debris after a fire call.[5] The firefighters kept their gear in their personal vehicles as they were expected to respond to calls when off duty.[6]

There were two fire stations in the City of Gladstone. Both stations had living quarters in addition to the garage bays where the firetrucks were parked. When the firetrucks were running, the living quarters would fill with diesel exhaust.[7] In addition, the firefighters kept their gear next to their beds when they slept at the station. As a result, the firefighters were exposed to both the fumes from the diesel exhaust and their gear when sleeping.

In the 1980s and 1990s, firefighter safety training primarily focused on avoiding thermal injuries and carbon monoxide exposure. Cline testified that the emphasis has changed in recent years: "Today in the modern environment, you can't pick up a trade magazine in the fire service that doesn't address the cancer risk to firefighters." Cline stated that "the big goal that you see everywhere now is to limit your exposure to known carcinogens and smoke because of occupational cancers." Cline noted that specific chemicals such as acrolein, benzene, and cyanide

---

[5] Donna Cheney testified that David Cheney would clean his gear at home if it was badly soiled from a fire. David Cheney would spray the gear off in the front yard and then wash the gear in their household washing machine. After washing the gear, the Cheneys would have to run wash cycles with just soap to rinse out the residue left in the washing machine.

[6] Early in their careers, Potter, Rierson, and David Cheney also worked as police officers for the City. While they were on-duty as police officers, they were required to respond to fire calls, perform firefighter functions and, upon completion of those duties, resume their shift as police officers. When this happened, they had no opportunity to shower or otherwise clean up prior to returning to their police duties.

[7] The firefighters testified that soot would accumulate on the walls in the living quarters of the firehouse from the diesel exhaust. In 1993, one of the stations underwent a remodeling that included the installation of an exhaust ventilation system. The other station remained unventilated.

4

are present in the smoke and fumes encountered by firefighters. Cline explained the dangers of inhaling these chemicals:

> Carbon monoxide is a chemical asphyxiant that attaches to your hemoglobin in your blood, and your body cannot properly take in oxygen and expel carbon dioxide. Hydrogen cyanide is the exact same thing; it's only about 300 times stronger than carbon monoxide. So you're creating tissue damage. More and more firefighter heart attacks are linked to those two – exposure to those two elements alone. And then you get into acrolein and especially benzene that are known carcinogenic materials, and those products are a byproduct of combustion from hydrocarbons, synthetic materials that are in the smoke. Those are proven carcinogenic materials that have been identified in typical house fire smoke.

Cline additionally noted that benzene is a byproduct of diesel combustion, and it is important to "limit anyone's exposure to diesel exhaust as much as possible." Potter and Rierson also testified to the increased awareness in recent years within the firefighting community to the dangers posed to firefighters from exposure to fumes and airborne particulates.

*Medical expert testimony*

Donna Cheney's first medical expert, Dr. James E. Lockey, is a board-certified physician in pulmonary medicine and occupational and environmental medicine. He works and teaches at the University of Cincinnati College of Medicine where the focus of his research is occupational and pulmonary disease and occupational medicine. At the time of trial, Dr. Lockey had participated as either an author or co-author on over 130 peer-reviewed publications, including a meta-analysis of 32 studies analyzing the cancer risk for firefighters, which was published in the Journal of Occupational and Environmental Medicine in November 2006. Based on their work, Dr. Lockey and his colleagues concluded that there were "four cancers . . . that were properly related to the job task of being a firefighter," including NHL. The research specifically found that firefighters had a "high relative risk at 1.51 [times the rate of non-firefighters]" of developing NHL, which "was statistically significant."

5

Dr. Lockey elaborated on his findings:

> . . . The potential exposures to firefighters is very complex and it can vary from one fire to the next based on what is being burnt, the combustion temperature, the duration a firefighter would spend in the fire, what gets deposited on their skin, et cetera.
>
> And it is known that firefighters are exposed to known carcinogens, including asbestos, benzene, black soot and diesel exhaust. They also have a potential exposure to trichloroethylene, which is a known carcinogen and has been associated with Non-Hodgkin's Lymphoma in certain studies.
>
> What we did was an observational study. It would be very difficult to characterize what one single agent may be responsible for the cancer, but it has been documented through this meta-analysis through this observational study, that if you work as a firefighter the risks are substantially higher than if you are in the general US population.

Dr. Lockey further noted that a subsequent study published through the National Institute of Occupational Safety and Health ("NIOSH") similarly found that "there was an increased risk for Non-Hodgkin's Lymphoma, particularly in people that had 20 years or longer duration of employment as a firefighter."

Based on his research and review of David Cheney's medical records, Dr. Lockey determined that "Mr. Cheney's employment as a firefighter was the prevailing factor in relationship to any other factor that caused his Non-Hodgkin's Lymphoma or follicular lymphoma and the associated disability related to that condition."[8]

Donna Cheney also offered the report of Dr. P. Brent Koprivica. Dr. Koprivica is board certified in preventative medicine and occupational medicine. He also has a master's degree in public health, focusing on occupational and environmental medicine. Dr. Koprivica reviewed David Cheney's medical records and conducted a physical examination of David Cheney prior to

---

[8] Dr. Lockey acknowledged that there was a statistical correlation between morbid obesity and follicular NHL and that, "[a]s with most cancers, the rate of Non-Hodgkin's Lymphoma increases with age[.]" David Cheney's body mass index put him in the morbidly obese category.

his death. He opined that "Mr. Cheney's exposure to risk as a fire fighter with the resultant exposures sustained in that employment represent the direct, proximate and prevailing factor in Mr. Cheney's development of non-Hodgkin's lymphoma."

The City's expert, Dr. Neel Shah, is board certified in internal medicine, medical oncology, and hematology. At the time of the hearing, he had completed multiple studies about cancer, including four recent research cases about NHL; and lymphomas were within his medical subspecialty. Dr. Shah reviewed David Cheney's medical records and relied upon his clinical and research experience as well as peer-reviewed medical journals to reach his conclusions. Dr. Shah testified that based on his research, NHL has no known cause. Dr. Shah clarified that "[a]ctually obesity is certainly linked to developing lymphoma. Certainly there's a couple other things, [such as age and race,][9] but the truth is we don't really know." Dr. Shah concluded that "[t]here's absolutely nothing in the medical literature to support [finding a relationship between David Cheney's occupational exposures as a firefighter and the development of his non-Hodgkin's lymphoma]." Dr. Shah admitted, however, that he had not reviewed Dr. Lockey's journal article or the later NIOSH study.

Dr. Phillip Bierman, David Cheney's treating oncologist, did not testify, but provided a letter that stated it was "impossible" to know the cause of David Cheney's NHL.

Following the hearing, the administrative law judge ("ALJ") issued a decision denying compensation, finding that the "firefighter causation standard" under section 287.067.6, RSMo[10]

---

[9] Dr. Shah stated that older people and "[w]hite Americans typically develop more non-Hodgkin lymphoma[.]"

[10] Unless otherwise noted, statutory references are to the Revised Statutes of Missouri, updated through the 2007 supplement.

Section 287.067.6 states that "[d]isease of the lungs or respiratory tract, hypotension, hypertension, or disease of the heart or cardiovascular system, including carcinoma, may be recognized as occupational diseases for the purposes of this chapter and are defined to be disability due to exposure to smoke, gases, carcinogens, inadequate oxygen, of paid firefighters of a paid fire department . . . if a direct causal relationship is established[.]"

was not applicable and that David Cheney's NHL was not the result of occupational exposure as a firefighter. Donna Cheney timely appealed the decision to the Commission.[11]

In its decision, the Commission found that the ALJ had "misinterpreted the established framework for analysis in an occupational disease case." The Commission stated that "[w]e find that the judge's analysis misses a critical distinction in causation as applied to occupational disease cases. The test is whether the occupational exposure creates an increased risk, as compared with the general public." The Commission further explained that "[s]imply because employee had additional risk factors, largely not within his control (age, race, sex), does not negate the impact of the increased risk factor caused by his occupation."

The Commission then stated that "[w]e have carefully analyzed the expert medical testimony and have found that Dr. Lockey provided the most relevant and persuasive testimony."[12] The Commission also noted that "Dr. Koprivica's report, based on examination of [David Cheney], and thorough review of patient records, is credible and persuasive." The Commission reversed the decision of the ALJ, agreeing that the "firefighter presumption" did not apply, but finding that David Cheney's "occupational exposure was the prevailing factor in development of the disease and disability." The City appeals from that judgment.

### Standard of Review

"We review the findings of the Commission, not the findings of the ALJ." *Gleason v. Treasurer of State of Mo.-Custodian of Second Injury Fund*, 455 S.W.3d 494, 497 (Mo. App. W.D. 2015) (citation omitted). A reviewing court "shall review only questions of law and may modify,

---

[11] Pursuant to section 287.480.1, "[i]f an application for review is made to the commission within twenty days from the date of the award, the full commission . . . shall review the evidence . . . and shall make an award[.]"

[12] The Commission acknowledged that Dr. Shah, the City's expert, testified that there is no known cause for NHL but discounted that testimony noting that "Dr. Shah's opinion did not take into account the studies reviewed by Dr. Lockey showing an increased risk as a result of the carcinogenic exposures which Dr. Shah and Dr. Lockey both identified."

reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other: (1) That the commission acted without or in excess of its powers; (2) That the award was procured by fraud; (3) That the facts found by the commission do not support the award; [or] (4) That there was not sufficient competent evidence in the record to warrant the making of the award." § 287.495.1. "Whether the award is supported by competent and substantial evidence is judged by examining the evidence in the context of the whole record." *Harley-Davidson Motor Co., Inc. v. Jones*, 557 S.W.3d 328, 331 (Mo. App. W.D. 2018) (quoting *Greer v. SYSCO Food Svcs.*, 475 S.W.3d 655, 664 (Mo. banc 2015)). "An award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence." *Id*. (quoting *Greer*, 475 S.W.3d at 664).

"The Commission, as the finder of fact, is free to believe or disbelieve any evidence." *Jackson Cnty. v. Earnest*, 540 S.W.3d 464, 469 (Mo. App. W.D. 2018) (quoting *Molder v. Mo. State Treasurer*, 342 S.W.3d 406, 409 (Mo. App. W.D. 2011)). "We defer to the Commission's findings as to weight and credibility of testimony and are bound by its factual determinations." *Id*. (quoting *Molder*, 342 S.W.3d at 409). "The Commission's determinations of law, however, are reviewed independently." *Gleason*, 455 S.W.3d at 497 (citation omitted).

**Analysis**

The City raises two points on appeal.[13] In Point I, the City alleges that the Commission erred in awarding Donna Cheney workers' compensation benefits for David Cheney's illness and

---

[13] In Point II, the City alleges that the Commission did *not* err in finding that the "firefighter presumption" under section 287.067.6, did not apply. Donna Cheney asks us to strike this point because the City does not challenge any decision made by the Commission. We agree, and we strike Point II. *See* Rule 84.04(d)(2)(B) ("Where the appellate court reviews the decision of an administrative agency . . . each point shall: [s]tate concisely the legal reasons for the appellant's claim of *reversible error*[.]" (emphasis added)); *see also Harrell v. Mo. Dep't of Corr.*, 207 S.W.3d 690, 692 (Mo. App. W.D. 2006) ("Appellants may seek redress in this court only regarding issues for which they are aggrieved.").

9

death, arguing that there was insufficient evidence for the Commission to find that occupational exposure was the prevailing factor in causing David Cheney's NHL.

*Link between NHL and exposures from firefighting*

Before addressing whether there was sufficient competent evidence that David Cheney's occupational exposure was the prevailing factor causing his NHL, we will first examine whether his NHL constituted an occupational disease. An "occupational disease" is "an identifiable disease arising with or without human fault out of and in the course of the employment." § 287.067.1, RSMo. "Ordinary diseases of life to which the general public is exposed outside of the employment shall not be compensable, except where the diseases follow as an incident of an occupational disease as defined in this section." *Id*. "To support a finding of occupational disease, an employee must provide substantial and competent evidence that they have contracted an occupationally induced disease rather than an ordinary disease of life." *Greenlee v. Dukes Plastering Svc.*, 75 S.W.3d 273, 277 (Mo. banc 2002) (citation omitted). The relevant inquiry is "(1) whether there was an exposure to the disease which was greater than or different from that which affects the public generally, and (2) whether there was a recognizable link between the disease and some distinctive feature of the employee's job which is common to all jobs of that sort." *Id*. (citation omitted).

In order to show a recognizable link between the disease and the job, a claimant must produce evidence "establishing a causal connection between the conditions of employment and the occupational disease." *Smith v. Cap. Region Med. Ctr.*, 412 S.W.3d 252, 259 (Mo. App. W.D. 2013) (citing *Vickers v. Mo. Dep't of Pub. Safety*, 283 S.W.3d 287, 292 (Mo. App. W.D. 2009)). This evidence must be medical evidence and must establish "a *probability* that working conditions caused the disease, although they need not be the sole cause." *Id*. (quoting *Vickers*, 283 S.W.3d at

10

292) (emphasis in original). "Missouri law does not require a finding of which specific chemical caused the occupational disease in question in order to recover under the Workers' Compensation Act." *Moreland v. Eagle Picher Tech., LLC*, 362 S.W.3d 491, 505 (Mo. App. S.D. 2012) (quoting *Kent v. Goodyear Tire & Rubber Co.*, 147 S.W.3d 865, 869 (Mo. App. W.D. 2004)). "An occupational disease exists when a peculiar risk or hazard is inherent in the work conditions and a disease follows as a natural result." *Id.* (quoting *Causey v. McCord*, 763 S.W.2d 155, 157 (Mo. App. S.D. 1988)).

The City argues that there is no recognizable link between NHL and David Cheney's work as a firefighter, relying on Dr. Shah's opinion that there is no known cause of NHL and no peer-reviewed literature connecting exposures experienced during firefighting to the development of the disease.[14] The Commission, however, found Dr. Lockey's testimony more "relevant and persuasive."

Dr. Lockey testified that his research found a recognizable link between firefighting and the development of NHL. He specifically discussed the occupational exposures experienced by firefighters, including breathing carcinogenic chemicals and fumes such as asbestos, benzene, black soot and diesel exhaust. David Cheney's former colleagues confirmed that David Cheney was regularly exposed to those types of chemicals and fumes through his work as a firefighter for the City.[15] Dr. Lockey explained that his research revealed that exposure to these fumes and

---

[14] As previously stated, Dr. Shah did not, as specifically noted by the Commission, review Dr. Lockey's research or the NIOSH study.

[15] Potter, Rierson, and Cline confirmed that firefighters employed by the City, including David Cheney, were regularly exposed to smoke, fumes, and particulates from burning items during fire calls. They explained that, following a fire call, they would often have black soot on their faces, hands, and gear; and they would expel black soot from their noses and mouths over the following days. This exposure was not limited to fire calls. These former colleagues of David Cheney described how the City's firefighters continued to be exposed to these particulates and fumes from the soot and debris adhered to their gear when they slept (because the gear was kept next to their beds) and while off-duty (firefighters were required to keep their gear in their personal vehicles). In addition, they were also exposed to diesel exhaust fumes within the firehouse during their shifts.

particulates made firefighters 1.51 times more likely than the general population to develop NHL, which he quantified as a "high relative risk." The NIOSH study reviewed by Dr. Lockey reached a similar conclusion. Dr. Lockey's testimony together with the testimony of David Cheney's former colleagues was competent evidence sufficient to establish the necessary nexus between David Cheney's occupational exposure to carcinogenic smoke, fumes and particulates while working as a firefighter for the City to the development of his NHL. *See Moreland*, 362 S.W.3d at 505 ("A single medical opinion will support a finding of compensability even where the causes of the disease are indeterminate." (quoting *Kelley v. Banta & Stude Const. Co., Inc.*, 1 S.W.3d 43, 48 (Mo. App. E.D. 1999))).

*Prevailing factor*

The City additionally argues that there was insufficient evidence in the record to support the Commission's finding that David Cheney's carcinogenic exposure as a firefighter was the prevailing factor in his development of NHL. We disagree.

"An injury by occupational disease is compensable only if the occupational exposure was the prevailing factor in causing both the resulting medical condition and disability." § 287.067.2. "'The prevailing factor' is defined to be the primary factor, in relation to any other factor, causing both the resulting medical condition and disability." § 287.020.3(1).

The City argues that "[t]he presence of other factors which have been known to cause [NHL], and the prevalence of follicular [NHL] even among those who are not firefighters, contradicts the Commission's finding" that David Cheney's occupational exposure was the prevailing factor in his development of NHL. In support, the City highlights Dr. Shah's testimony that the development of NHL can be influenced by factors unrelated to firefighting, such as age, race, and weight. However, the existence of additional risk factors for NHL falling outside the

12

sphere of occupational exposure, or even that David Cheney possessed some of those risk factors, does not compel the conclusion sought by the City. The relevant question is whether David Cheney's occupational exposure to toxic fumes and particulates during the course of his employment as a firefighter[16] was the "prevailing factor" in causing his NHL.[17] In this case, the Commission answered this question in the affirmative.

Both Drs. Lockey and Koprivica reviewed David Cheney's medical records. Dr. Koprivica also conducted a physical examination of David Cheney before his death. Based on the information gleaned from the records and the physical examination, both doctors concluded that David Cheney's occupational exposure to carcinogenic smoke, fumes, and particulates experienced during his employment as a firefighter for the City was the prevailing factor in the development of his NHL. The Commission found this evidence credible and persuasive, and we defer to this finding. *See Custer v. Hartford Ins. Co.*, 174 S.W.3d 602, 617 (Mo. App. W.D. 2005) (quoting *Kerns v. Midwest Conveyor*, 126 S.W.3d 445, 452-53 (Mo. App. W.D. 2004)) ("[O]ur courts have consistently held that the Commission, in cases of competing expert medical evidence, is free to pick and choose which expert to believe."); *see also Dierks v. Kraft Foods*, 471 S.W.3d 726, 736 (Mo. App. W.D. 2015) (quoting *Treasurer of Mo.-Custodian of Second Injury Fund v. Witte*, 414 S.W.3d 455, 460 (Mo. banc 2013)) ("[T]his Court is obligated to 'defer to the [C]omission on issues of fact, the credibility of the witnesses, and the weight given conflicting evidence.'"). This evidence was sufficient to support the Commission's finding that David Cheney's occupational

---

[16] Dr. Shah conceded that "all firefighters" are exposed to known carcinogens.

[17] A claimant need not establish that the occupational exposure was the sole contributing cause of the medical condition and disability to constitute an occupational disease; rather there must be competent and substantial evidence that occupational exposure "which was greater than or different from that which affects the public generally," was the "prevailing factor" in the development of the disability. *See Moreland*, 362 S.W.3d at 500 (finding that the claimant's multiple myeloma was an occupational disease based on medical testimony stating that the claimant's exposure to chemicals in his workplace "was a substantial factor more likely than not contributing to his myeloma.").

13

exposure as a firefighter to carcinogenic materials was the prevailing factor in his development of NHL.

Therefore, after reviewing the evidence, giving deference, as we must, to the weight and credibility determinations of the Commission, we conclude that the Commission's award is supported by sufficient competent evidence. Point denied.

## Conclusion

The judgment of the Commission awarding workers' compensation benefits is affirmed.

_____
EDWARD R. ARDINI, JR., JUDGE

All concur.